# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FOY J. RUSSELL,

      Plaintiff,

vs.                                                                          No.  01cv1017 JHG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Russell's) Motion to Reverse or Remand Administrative Decision [**Doc. 9**], filed May 15, 2002.  The Commissioner of Social Security issued a final decision denying Russell's application for supplemental security income.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and recommends that it be DENIED.

Russell, now forty-four years old, filed his application for supplemental security income on November 13, 1997, alleging disability since June of 1987, due to degenerative disc disease, a back injury, a leg injury, severe pain, and depression.  He has a tenth grade education and past relevant work as a welder, brick layer, and oil field inspector.  The Commissioner denied Russell's application for supplemental security income both initially and on reconsideration.  On December 11, 2000, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Russell had severe impairments consisting of back and ankle problems, depression, and a history of

substance abuse.  Tr. 13.  However, the ALJ found Russell did not have any disorder or combination of disorders meeting or equaling in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1.  Specifically, the ALJ reviewed Sections 1.00 and 12.00 *et seq.* of the Listing of Impairments.  *Id.*  The ALJ also found Russell's subjective complaints were not supported by the medical evidence to the extent he alleged.  The ALJ further found Russell retained the residual functional capacity (RFC) to perform simple, unskilled light-level work activity.  Tr. 17.  Russell filed a Request for Review of the decision by the Appeals Council.  On July 25, 2001, the Appeals Council denied Russell's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Russell seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse and remand, Russell contends the ALJ's reliance on

the Medical Vocational Guidelines (the grids) was error and contrary to law because the ALJ

assumed his mental impairment resulted only in a limitation on his ability to perform skilled work,

and because the ALJ used the grids as a framework without the aid of testimony from a

vocational expert.

Russell contends he has a mental impairment that affects his ability to perform the daily

requirements of full-time employment.  On August 20, 1998, Dr. Clifford O. Morgan, a

psychologist, evaluated Russell.  Tr. 137-145.  The Division of Vocational Rehabilitation

requested Dr. Morgan conduct a psychological/vocational evaluation to assess Russell's status at

that time.  Dr. Morgan conducted a clinical interview, a mental status examination, a psychosocial

history, and administered several psychological tests.  Tr. Tr. 137.  Dr. Morgan found, *inter alia*,

as follows:

> **ACTIVITIES OF DAILY LIVING**
> Joe get up between 5:00 and 6:00 in the morning.  He is positive to his own self
> care.  Joe reports difficulty sleeping, and the most he sleeps is four hours in a row.
> Joe states that he is never comfortable because of his back pain.  Joe does his own
> cooking and laundry; and, he enjoys cooking outside.  During the day, Joe visits
> various friends and relatives.  Joe does not have a specific schedule he follows
> during the day.
>
> **MENTAL STATUS EXAMINATION**
> Mood was depressed, and Joe did admit to having some suicide urges; however,
> he was not actively suicidal at the time of the evaluation.  Affect was somewhat
> flat.  No psychotic processes were observed or disclosed.  Insight was appropriate
> for the purpose of the evaluation.

Joe was oriented to time and place.  Immediate recall was intact; however, delayed recall was impaired as Joe was unable to remember three words I had asked him to remember previously.  Joe was able to do Serial 7's from 100; but, he was unable to spell the word, "world" backwards.  Joe was able to tell time, and no difficulties with speech were noted.  He was able to follow simple verbal and written instructions.  Reading level was adequate to fill out a simple office form and read questionnaires at the sixth grade level.  Joe was able to copy a simple overlaid geometric design.  When asked to write a simple sentence, he printed, "My name is Joe."

## PSYCHOLOGICAL TESTING

### Cognitive Status:
Mental status examination and neuropsychological screening indicates that Joe has some mild cognitive impairment.  This impairment is possibly related to depression and long term alcohol abuse.  Joe's intelligence is within the Average Classification of Intelligence and Aptitude when he is compared with his age group.  There was no significant difference between his Verbal and Performance abilities.  Most of the scores were within the Average Range with the exception of Digit Symbol which was significantly Below Average.  Digit Symbol is a complex measure of visual processing, short term memory and motor speed.  Individual (sic) with severe depression and/or cognitive impairment often score low on Digit Symbol.  With the exception of his mild cognitive impairment which effects (sic) attention, concentration and working memory, Joe has not (sic) intellectual problems which would interfere with employment.

### Emotional Status:
Joe scored within the Severe Classification for Depressive Symptoms on the Inventory to Diagnose Depression.  Joe also met criteria of Major Depressive Disorder.  Joe reports difficulty with physical exhaustion, and he is both depressed and restless.  Joe has lost interest in most activities which used to interest him.  He has frequent thoughts of killing himself, but he states that he would not carry them out.  He also reports difficulty with attention span and decision making.  He reports that (sic) both appetite and sleep disturbance.  Joe feels very discouraged about the future most of the time.  Joe is also very worried about his physical health.

Joe was administered the Battery for Health Improvement (BHI).  The BHI was normed on physically injured persons as well as non-injured persons.  The BHI measures Psychological, Environmental and Physical Factors related to work related injuries.  Joe's BHI was valid.  On the Physical Factors Scales, Joe had very high scores on Depression and Chronic Maladjustment.  Also elevated were Hostility, Borderline and Substance Abuse Scales.  Joe's Environmental Factors

Scales were not significantly higher than those of an average patient. Joe had high scores on the Somatic Complaints and Pain Complaints Scales.

Joe is severely depressed, and he feels resentful about his circumstances. He is grieving over the changes in his life caused by his health problems, and he feels extremely discouraged about his circumstances. Individuals who score similar to Joe are often so depressed and angry that they have difficulty functioning in a rehabilitation setting. Joe also may have personality characteristics which pose barriers to vocational rehabilitation. On the BHI, he endorsed items having to do with not being a good student, having unstable relationships, and engaging in impulsive behavior. Joe also reported a history of substance abuse.

Joe was classified as Chemically Dependent on the SASSI with both Obvious and Subtle Attributes. This means that Joe endorsed items in a similar manner to other individuals diagnosed with a Chemical Dependency problem. It may be important to note that Joe is not necessarily in denial of his alcohol abuse; but, he did tend to rationalize it by saying that he drinks to relieve his pain.

In summary, it would appear that Joe has emotional/behavioral problems which began during childhood. He reports being raised in an alcoholic home, and he suffered physical abuse from his father. It would appear that Joe had a learning disability, and this exacerbated his problems at school. He was finally expelled for his behavior, and then entered a vocational life of working in the oil fields. Joe reports a history of unstable relationships with one marriage and a long term cohabitation. Joe also reports long term alcohol abuse. Joe has probably had long term depression. After his physical injury, it would appear that Joe could no longer cope well enough to vocationally rehabilitate himself. He appears to be currently depressed as well as abusing alcohol.

## SUMMARY/CONCLUSIONS

Foy (Joe) Russell is a 41 year old man who was referred to DVR by ISD. He is also applying for SSDI benefits. Self reported information and file information is somewhat inconsistent as to the date when he last worked. It was either 1987 or 1989. File information indicates that Joe last worked in 1987 when he injured his lower back area. Several years later, he had two discs removed and a fusion with internal fixation performed. Later, the rods were removed. He apparently was on Workman's Compensation until 1993. He has prescriptions for Soma and pain pills. A recent evaluation (May 1998) by Dr. Emmett Altman states that Joe will not be able to do heavy work. His conclusions were, "he has limited back motions, solid fusion, and well healed ankle fracture with no signs of any arthritic changes." Joe is currently living on General Assistance and help form family. In addition to his physical problems, Joe also has long term depression and alcohol dependency.

6

Results of the evaluation indicate that Joe does have capabilities both intellectually and academically.  He is certainly capable of earning a GED; but, he appeared ambivalent about pursuing a GED.  Joe appeared very depressed, and he also did not appear motivated for rehabilitation services.  However, his lack of motivation may have been secondary to his depression.  Joe has a long history of unemployment, and in fact has apparently never been substantially employed since his back injury.

**RECOMMENDATIONS**

1.)  Joe will need to address his depression and substance abuse issues prior to job training or placement.  It is recommended that Joe be referred for treatment for depression and alcohol dependency.  It is also recommended that Joe be evaluated for the use of medication for his depression.

2.)  Joe's employment opportunities would be helpful if he obtained a GED. Therefore, it is recommended that he be refereed for GED preparation and testing.

3.)  Current prognosis for successful vocational rehabilitation is guarded at this time.  It is recommended that Joe be given assignments to address recommendations #1 and #2 above prior to any engagement in vocational placement.

Tr. 137-144.  Dr. Morgan diagnosed Russell with (1) Reading Disorder; (2) Disorder of Written

Expression; (3) Alcohol Dependency; and (4) Major Depressive Disorder, Single Incident.  Tr.

145.  Additionally, Dr. Morgan assigned a current Global Assessment of Functioning (GAF)[1]

score of 65 to Russell.  A score of 65 indicates "some mild symptoms (e.g., depressed mood and

mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional

truancy, or theft within the household), but generally functioning pretty well, has some meaningful

interpersonal relationships."  American Psychiatric Assoc., Diagnostic and Statistical Manual of

---

[1] Global Assessment of Functioning (GAF score) is a subjective determination which represents the clinician's judgment of the individual's overall level of functioning.  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994), p. 32.

Mental Disorders (DSM-IV), (4th ed. 1994), p. 34.  Moreover, although Dr. Morgan

recommended Russell address his depression and substance abuse issues, Russell did not follow

this recommendation until December of 1999.

On  December 3, 1999, a psychiatrist evaluated Russell at the Southwest Counseling

Center, Inc.  Tr. 128-135.  The "M.D. Psychiatric Evaluation Note" indicates a DVR counselor

named Kay referred Russell to the Southwest Counseling Center.  Tr. 134.  Russell informed the

psychiatrist Kay had sent him for depression "after he was felt to be so by the SSI psychiatrist

who saw him 1 year ago."  *Id.*  Russell reiterated the same history as he had to Dr. Morgan.

Russell indicated he didn't know if he was depressed but expressed an interest in medication for

his depression and to help him sleep.   Tr. 131.  The psychiatrist diagnosed Russell with

"Depression, NOS– probably Major Depression" and "Polysubstance Abuse–in remission?"  *Id.*

The psychiatrist also assigned a GAF score of 55 to Russell.  Tr. 128.  A GAF score of 55

indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

attacks) **or** moderate difficulty in social, occupational, or school functioning (e.g., few friends,

conflicts with peers or co-workers)."  DSM-IV at 34.  The psychiatrist prescribed Remeron[2]  30

mg. ½ tablet one hour before going to sleep and instructed Russell to return for a follow-up in

two weeks.  *Id.*

On December 17, 1999, the same psychiatrist saw Russell.  Tr. 129.  Russell reported

Remeron was helping him sleep, he was now sleeping up to six hours and stated "that's good."

---

[2] Remeron is indicated for the treatment of depression.  Physicians' Desk Reference 2147
(53 ed. 1999).

Russell wasn't sure if it was helping his mood.  The psychiatrist increased the Remaron to 30mg. at bedtime.  *Id.*

On January 1, 2000, Russell returned to the Southwest Counseling Center for a follow-up. Tr. 127.  On that day, a registered nurse reported Russell had stated "I can tell I'm feeling better." *Id.*  The nurse's notes indicate Russell was in for a medication check and had reported he had done well over the holidays, a difficult time of the year for him.  Significantly, Russell reported his mood had improved with the Remeron.  *Id.*  The nurse's notes also indicate Russell's appearance was neat/clean, he was open, alert, his psychomotor activity was normal, his speech slowed, his mood euthymic,[3] affect was appropriate, he was oriented to time, place, person and purpose, his memory was fair, and his thought process was logical, coherent and goal oriented.  *Id.*  Because Russell reported his energy level was low due to his taking the medication late at night, the nurse changed the time he was to take the medication.  *Id.*  Russell, however, reported his appetite was intact, his concentration was alright, and his task completion good.  *Id.*  The nurse instructed Russell to return for a follow-up in three weeks.

On January 28, 2002, Russell returned as instructed for a follow-up.  Tr. 126.  The nurse made the same observations as she had on his last visit.  Russell reported that on a scale of 1-10, with 10 being the worst, he felt like a five or six.  *Id.*  Russell also denied substance or alcohol abuse and reported an improved energy level, appropriate sleep pattern, and normal appetite. Russell reported he had taken the Remeron as instructed and was sleeping better.  *Id.*  The nurse

---

[3] Euthymic is defined as relating to, or characterized by, euthymia.  Euthymia is "a moderation of mood, not manic or depressed.  *Stedman's Medical Dictionary* 606 (26th ed. 1995).

increased the Remeron to 45 mg. at bedtime and instructed Russell to continue with his substance

abuse counseling.  There are no further clinician or nursing notes.  However, on August 30, 2000,

Michael O'Malley, a Clinical Specialist with the Southwest Counseling Center, submitted a letter

to verify that Russell had continued to receive substance abuse counseling and had shown

improvement and would continue to receive counseling at the facility.  Tr. 248.

In his decision, the ALJ found as follows:

> The Medical Vocational Guidelines, as set forth in Appendix 2, Subpart P, Social
> Security Regulations No. 4, take notice of unskilled jobs in existence in significant
> numbers throughout the regional and national economies. The rules set forth in
> these guidelines are determinative of disability.  Where the vocational profile of the
> claimant coincides with a rule, then that rule directs a conclusion regarding
> whether or not jobs exist in significant numbers which the claimant can perform.
> These guidelines cannot be applied blindly when there are non-exertional
> impairments, such as this claimant's alleged pain complaints and depression.
> However, I have already determined that his pain symptoms are not entirely
> credible because they are not supported by the objective medical evidence and they
> are inconsistent with his treatment regimen and his actual level of everyday
> activities.  He currently takes very little medication for pain (Exhibit 4E).  His
> depression has improved with medication, and mental status examinations have
> shown essentially intact mental functioning.  The latest report from his counselor
> suggests that he is responding favorably to treatment (Exhibit 30F).  I find that he
> can still do simple work tasks.

> In this situation, therefore, the vocational rules can serve as a framework and guide
> for decision-making.  Rule 202.18 (Table No. 2– Residual Functional Capacity
> Limited to Light Work) serves as a guide and leads to a conclusion of not disabled.
> Based on his capability to do other kinds of jobs in accord with the above-cited
> rule, I find that Mr. Russell has not been disabled at any time since filing his
> application for benefits and through the date of this decision.

Tr. 20-21.  Russell contends the ALJ erred in relying on the grids to find him not disabled.

Russell argues the ALJ must consider nonexertional impairments in his RFC determination

because the existence of nonexertional impairments limits the ALJ's ability to apply the grids

conclusively to find non-disability.  Russell contends the grids may be used only as a framework

for consideration of how much the individual's work capability is further diminished in terms of

any types of jobs that would be contraindicated by the nonexertional limitations.  Therefore,

Russell maintains "the ALJ circumvented the legal requirements that he use step five only as a

framework when he made the essentially medical and vocational determination that the limitations

caused by [his] mental impairments affect his ability to work only by limiting him to unskilled

jobs."  Mem. in Supp. of Mot. to Reverse and Remand at 6.

      The grids represent the Secretary's administrative notice of the jobs that exist in the

national economy at the various functional levels.  *Channel v. Heckler*, 747 F.2d 577, 579 (10th

Cir. 1984).  If the ALJ's findings of fact regarding a particular individual's age, education,

training, and RFC all coincide with the criteria of a particular rule on these grids, the Secretary

may conclude that jobs suitable for the claimant exist in the national economy and that the

claimant therefore is not disabled.  *Id.*  Because the grids classify RFC based only on exertional or

physical strength limitations, they may not be fully applicable to claimants with nonexertional

impairments.  *See* 20 C.F.R. 404.1567; *Channel*, 747 F.2d at 580-81.  Nonexertional impairments

are medically determinable impairments, including pain, that do not directly limit physical

exertion, but may reduce an individual's ability to perform gainful work nonetheless.  *Id.* at 580.

      If nonexertional impairments narrow the range of possible work the claimant can perform,

the Secretary may only use the grids as a "framework" for determining whether, in light of all

claimant's impairments, he has meaningful employment opportunity within the national economy.

20 C.F.R. pt. 404, subpt. P, App. 2, 200(e)(2).  In such cases, the ALJ must also produce a

vocational expert to testify whether specific jobs appropriate to claimant's limitations exist in the

national economy.  *Channel,* 747 F.2d at 581.  However, only significant nonexertional

11

impairments that limit a claimant's ability to do the full range of work within a classification

prevents the ALJ from relying on the grids. *See Thompson v. Sullivan*, 987 F.2d 1482, 1488

(10th Cir. 1993). The grids may still be used if a claimant has nonexertional impairments which

do not significantly reduce the underlying job base. *See Evans v. Chater,* 55 F.3d 530, 532 (10th

Cir. 1995).

 In this case, the ALJ applied Table No. 2, Rule 202.18 which addresses the RFC for light

work for a younger individual with limited or less education (at least literate and able to

communicate in English) and with previous work experience that would be considered skilled or

semi-skilled, but the skills would not be transferable. Pursuant to Rule 202.18, the ALJ found

Russell was not disabled.

 In his decision, the ALJ noted that the grids "take notice of unskilled jobs in existence in

significant numbers throughout the regional and national economies. The rules set forth in these

guidelines are determinative of disability." Tr. 20. The ALJ also acknowledged that "[t]hese

guidelines cannot be applied bindingly when there are non-exertional impairments, such as this

claimant's alleged pain complaints and depression." *Id.* The ALJ then concluded, "However, I

have already determined that his pain symptoms are not entirely credible because they are not

supported by the objective medical evidence and they are inconsistent with his treatment regimen

and his actual level of everyday activities." *Id.* In regards to Russell's depression, the ALJ found

"His depression has improved with medication, and mental status examinations have shown

essentially intact mental functioning. The latest report from his counselor suggests that he is

responding favorably to treatment." *Id.* Therefore, the ALJ found Russell's nonexertional

impairments, i.e., pain and depression, were not significant nonexertional impairments that would limit his ability to do the full range[4] of light work. Substantial evidence supports this conclusion.

Although Dr. Morgan assessed Russell with Major Depressive Disorder on August 20, 1998, by January 28, 2000, Russell was much improved. The January 28, 2000 "RN Follow-up Notes" indicate Russell was functioning very well. Tr. 126. The nursing notes indicate his mood was euthymic, his energy level was improved, his sleep was appropriate, his appetite intact and his concentration unchanged. *Id.* The nursing notes from the previous visit reflect Russell's concentration was alright and his task completion good. Tr. 127.

Russell contends the ALJ "made the essentially medical and vocational determination that the limitations caused by [his] mental impairments affect his ability to work only by limiting him to unskilled jobs." Mem. in Supp. of Mot. to Reverse at 6. The Court disagrees. The ALJ was referring to Appendix 2, Subpart P which in fact states that "in promulgating the rules, administrative notice has been taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels . . . ." *See* 20 C.F.R. pt. 404, subpt. P, App. 2, 200(b).

Finally, Russell contends the ALJ's use of the grids as a "framework" when he had acknowledged that the grids could not be used conclusively because of his mental impairment "is problematic." Mem. in Supp. of Mot. to Reverse at 7. Although the ALJ's Decision could have been better articulated, it is clear the ALJ conclusively relied on the grids to find Russell was not disabled because he found his mental impairments did not impact on Russell's ability to do light

---

[4] Social Security Ruling 83-10 defines "full range of work" as "[a]ll or substantially all occupations existing at an exertional level. Social Security Ruling 83-10, 1983 WL 31251, *6 (1983).

work.  *See Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)(Minimal

error by ALJ does not require reversal or remand.)  Accordingly, the Court finds the ALJ's

Decision that Russell was not disabled is supported by substantial evidence and is affirmed.

A judgment is accordance with this Memorandum Opinion and Order will be entered.




_____
**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**